UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-MJ-8068-BER

UNITED STATES OF AMERICA,

v.

ELLIOT SMERLING,

        Defendant.
_____

FILED BY ____KJZ____ D.C.

Mar 4, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## PRETRIAL DETENTION ORDER

The Court, pursuant to 18 U.S.C. § 3142, commonly known as the Bail Reform Act of 1984, hereby ORDERS the Defendant, ELLIOT SMERLING, detained pursuant to the provisions of Sections (b), (e) and (f).

Defendant appeared before the Court on March 3, 2021, for a detention hearing. Defendant waived his physical presence in the Courtroom and consented to appear via Zoom video conference (VTC) from the U.S. Marshal's cell block at the Federal Courthouse in West Palm Beach. The Court finds that the hearing could not be delayed without serious harm to the interests of justice and found Defendant's waiver of his personal presence in the courtroom and consent to appear by video teleconference to be knowing and voluntary. Therefore, the hearing proceeded via Zoom VTC. The Government was represented by AUSA Adam McMichael, and the Defendant was represented by David Kubiliun, Esq.

The Government moved for pretrial detention of Defendant on the basis that he presents a serious risk of flight or nonappearance. After conducting a detention hearing, the Court specifically finds that there is a serious risk of flight or nonappearance of Defendant if he is released, and further, that no condition, or combination of conditions, will reasonably assure the appearance of

Defendant as required. The Court makes the following findings of fact with respect to this order for detention.

    Factors:

    **a)**     **The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.**

Defendant is charged by Criminal Complaint with wire fraud (Count I), in violation of 18 U.S.C. § 1343, and aggravated identity theft (Count II), in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and (b)2. He is facing a substantial sentence. If convicted of Count I, the maximum term of imprisonment to be imposed is 30 years. If convicted of Count II, he faces a two-year mandatory minimum sentence that must run consecutively to any other sentence imposed in this case. Further, Defendant's guideline range as estimated by the prosecution is approximately 210 to 266 months in prison if Defendant is convicted. This is a very serious fraud involving approximately $95,000,000 fraudulently obtained from the victim bank, and the fraud involved forgeries, fraudulent misrepresentations, falsified documents, and identity theft. Although the offense conduct does not involve a crime of violence or narcotic drugs, it does involve a high level of deceit, fraud and misrepresentation. Moreover, approximately $80,000,000 of the fraudulently obtained funds remains unaccounted for at this time. The nature and circumstances of the charged offenses strongly favors detention.

    **b)**     **The weight of the evidence against Defendant.**

The weight of the evidence against Defendant is very substantial. The Court takes judicial notice of the information in the Criminal Complaint and Affidavit, and the Pretrial Services Report. The following evidence was established by the Criminal Complaint and affidavit, the testimony of Special Agent Timothy Lucey of the FBI, the Government's proffer, and Defendant's proffer.

    This case involves a large-scale financial fraud involving approximately $95,000,000

wherein Defendant is alleged to have defrauded one bank (the Victim Bank), to pay a massive debt owed by his private equity fund to a second bank (the Commercial Bank), by impersonating various officers of a university endowment fund and an investment fund and forging several documents. On or around December 1, 2020, Defendant contacted the Victim Bank concerning his desire to acquire a $95,000,000 loan for his private equity fund. Thereafter, over the next several days, Defendant communicated several materially false statements to the Victim Bank, including an "audit letter," which purportedly was sent by an Audit Firm to attest to the sound finances of Defendant's private equity fund, and several "subscription agreements," which purportedly were signed by investors in the fund. These "investors" included the Chief Investment Officer of a university endowment fund and the Chief Executive Officer of an investment fund.

Based upon these communications, misrepresentations, and fraudulent documents, the Victim Bank wired approximately $95,000,000.00 to the Commercial Bank's Manhattan Branch for the benefit of Defendant's private equity fund on or about February 3, 2021.

Thereafter, FBI Special Agent Lucey communicated with the Audit Firm, the address of which was incorrectly listed on the letterhead of the forged Audit Letter, and he determined that Defendant's private equity fund was not a client of the Audit Firm. Special Agent Lucey also communicated with the Chief Investment Officer of the university endowment fund, who stated that he had never heard of Defendant or his private equity fund. Finally, Special Agent Lucey communicated with the Chief Executive Officer of the Investment Fund, and determined that the CEO's purported signature on that subscription agreement was a forgery. Of the $95,000,000 obtained in this fraud, approximately $80,000,000 remains unaccounted for at this time. The substantial weight of the evidence against Defendant is a factor that strongly favors detention.

### c) The history and characteristics of Defendant.

Defendant refused to be interviewed by Pretrial Services (PTS).[1] According to statements made to PTS by Defendant's wife, searches of law enforcement and public records databases, and a review of other investigative sources, Defendant was born on November 10, 1968, in New York state. Defendant appears to be associated with the University of Miami as a student. Defendant's wife indicated that Defendant attended college in Tampa, Florida and earned a master's degree in business in 1997. According to the Florida Department of Highway Safety and Motor Vehicles ("DHSMV"), Defendant has a valid U.S. passport which expires on July 25, 2028. Defendant has engaged in extensive pre-COVID international travel.

Defendant's wife, Elaine Maria Smerling (nee: da Paixao), age 46, indicated that they were married on May 24, 2003, in Broward County, Florida. Together, they have two children, who live with them. Defendant's wife said that she and her children are healthy, and she is a homemaker. She also stated that she is from Brazil and has both a Brazilian and a U.S. passport. Records indicate she was naturalized as a U.S. citizen on April 21, 2009. Mrs. Smerling is a dual Brazilian and United States citizen. At the March 3, 2021 hearing, Defendant's wife testified that her father bequeathed a house to her in Brazil. She still has family in Brazil.

Defendant's wife indicated that Defendant has been "self-employed" with Smerling Financial for his entire life. She stated that she only knew the business to be involved with mergers and acquisitions. According to the Florida Division of Corporations, Defendant is associated with the Smerling Financial Group, LLC, and Smerling Financial Group Management, Inc., both of which are active corporations. According to PTS, Defendant may also be associated with Canes Fourteen, LLC,

---

[1] The Court does not hold Defendant's refusal to speak to PTS against him in any way in reaching its decision here.

and Canes Two, LLC. The principal address for these businesses is the same address as Smerling Financial Group. Additionally, there are several different corporations listed in the Florida Division of Corporations, from Canes One, Canes Two, Canes Three, *et seq*., to Canes Thirty, LLC, and Jes Global Capital Gp, LLC, which all have the same principal address. According to LexisNexis, Defendant is associated with Cane Holdings Group, LLC, as a manager; Toastabags U.S.A., as the vice president; Cane Investment Group, LLC, as a member manager; Cypress Realty Group, Inc., as a director; MFS Restructuring Co. LLC, as a member manager; CRS, LLC, as a member manager; JES Global Capital, as a manager; JES Global Capital Gp LLC, as a manager; Smerling Financial Group, Inc., as a director; Cane Holdings Group, LLC, as a manager; and the Hamblin Village Homeowners Association, Inc., as a director and vice director. It is unclear what Defendant's actual association with these corporations are.

According to Defendant's wife, their assets consist of two residences, four vehicles (a Cadillac SUV, a Mercedes Van, a Corvette, and a Ferrari) and two joint bank accounts (she was unsure of the balance on one account but knew the other account had a balance of $54,000). Defendant's wife indicated they have residences at 11353 Manatee Terrace, Lake Worth, FL 33449 and 3049 Hartridge Terrace, Wellington, FL 33414. The Manatee Terrace residence was originally purchased by Defendant and his wife but was later sold to "Canes Fourteen, LLC" for $1.8 million in June 2016. According to the Palm Beach County Property Appraiser, the Hartridge Terrace residence was sold to Defendant, his wife, and his father in January 2005 for $565,954. That property was then sold to "Canes Two, LLC" for $550,000 in February 2018.

According to DHSMV, the following vehicles are registered to "Canes Twelve, LLC": a 2014 Ford F150 SVT Raptor, a 2020 Cadillac Escalade ESV Platinum, 1991 Harley-Davidson FLSTF, a 1996 Triumph Thunderbird, a 2017 Porsche Panamera Turbo Executive, a 2017 Mercedes-Benz G63

AMG, and a 2021 Audi SQ8 Prestige. The Defendant has significant assets.

The Court notes that Defendant filed for Chapter 7 bankruptcy in March 1994, in the Southern District of Florida. The Court also notes that Defendant has two current federal tax liens in the amount of $7,323.00 each.

According to Defendant's wife, as well as a member of the community and friend of Defendant, and a lawyer in Baltimore, Maryland, Defendant is a good person who would do anything for anybody, and also will certainly appear at future Court proceedings. The Court has carefully considered that testimony presented by the Defendant, and defense counsel's proffer, in reaching its decision here.

The fact that Defendant is a U.S. citizen and a good father and husband, with a residence in the Southern District of Florida, are all factors which militate against detention. However, Defendant also possesses significant assets which would allow him to flee, and as noted previously, approximately $80,000,000 alleged to have been obtained in the fraud is unaccounted for at this time. Further, Defendant's wife has strong ties to Brazil and holds Brazilian citizenship; if the Defendant fled to Brazil with his wife and family, there would not be any viable way for the United States to extradite Defendant from Brazil to the United States.

      **d)      The criminal history of Defendant.**

Defendant has no criminal history. This is a factor which militates against detention.

      **e)      The likelihood of Defendant's appearance in court if released.**

The Court has carefully considered and weighed all of the relevant factors under the Bail Reform Act, 18 U.S.C. 3142, and applicable case law. The Court finds that there is a serious risk that Defendant will flee or fail to appear if released. This Court further finds that there is no condition or combination of conditions of release that will reasonably assure Defendant's presence if Defendant is released. These findings are based upon all of the relevant facts, including the very

serious nature of the charges; the substantial weight of the evidence against Defendant; the substantial prison sentence Defendant is facing if convicted, which, at Defendant's age, could amount to a life sentence[2]; the fact that Defendant allegedly fraudulently obtained approximately $95,000,000.00 by forging signatures, engaging in deceit, and providing blatantly false and fantastical statements to the Victim Bank; the fact that approximately $80,000,000.00 of the allegedly fraudulently obtained money is currently unaccounted for; the fact that this money, along with Defendant's other significant assets, could readily allow Defendant to flee to the shelter of a foreign jurisdiction, such as Brazil[3]; Defendant's connections together with his wife's connections, to Brazil; the known difficulty or impossibility of extraditing individuals from Brazil to the United States, especially when they have citizenship or family ties to Brazil; the ease with which Defendant could flee the United States given his own substantial assets and the unaccounted for money; Defendant's extensive pre-COVID international travel; and his relationships with foreign banks and knowledge of domestic and international finance. The Court does finds that the Government has proven that Defendant is a serious risk of flight or nonappearance by a preponderance of the evidence.[4]

---

[2] The lengthy jail sentence that could be imposed for the charged crimes provides an incentive to flee. *United States v. Sabhnani*, 493 F.3d 63 at 77 (2d Cir. 2007).

[3] In the Bail Reform Act of 1984, Congress specifically instructed courts to consider the "financial resources" of a Defendant in order to determine whether a defendant should be detained pending trial. 18 U.S.C. § 3142(g)(3)(A). In keeping with this directive, this Court has previously considered financial resources to be a factor which can militate in favor of detention, especially if, as in the instant case, the financial resources are unaccounted for and/or were realized during the crime with which the defendant is currently charged. *See, e.g., U.S. v. Weeks*, 2019 WL 7044548 (S.D. Fla. Dec. 20, 2019) (the defendant had "extensive assets in cryptocurrency totaling millions of dollars which are unaccounted for and which could support him if he chose to flee with his wife and child to a foreign jurisdiction"); *accord United States v. Shelikhov*, 468 Fed.Appx. 54, 56 (2d Cir. 2012) (finding risk of flight based on the defendant's leadership role in a conspiracy that produced $50 million in unaccounted for ill-gotten gains); *United States v. Liebowitz*, 669 Fed.Appx. 603 (2d Cir. 2016) (potential of lengthy jail sentence, ties to foreign jurisdiction, and substantial resources to finance flight, supported detention on serious risk of flight grounds).

[4] The Court is troubled by the fact that approximately $80,000,000 is unaccounted for at this time. This provides Defendant with both a strong incentive and ability to flee and evade prosecution. Defendant's counsel stated at the

Accordingly, it is hereby **ORDERED** that Defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The Court directs that Defendant be afforded reasonable opportunity for private consultation with counsel; and the Court directs that, on order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility in which Defendant is confined deliver Defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

**DONE and ORDERED** in Chambers at West Palm Beach in the Southern District of Florida, this 4th day of March 2021.

*[signature: William Matthewman]*
WILLIAM MATTHEWMAN
United States Magistrate Judge

---

March 3, 2021 detention hearing that Defendant has entered into a written agreement to repay $80,000,000 to the Victim Bank by April 31, 2021, and that he has already repaid $15,000,000 to the Victim Bank. In the event that the unaccounted for $80,000,000 is located, and/or is returned to the Victim Bank, those facts may be considered by the Court if the Defendant seeks to reopen the detention hearing based on new evidence as contemplated by 18 U.S.C. 3142(f)(2)(B). However, since this is a removal case, and this Court will lose jurisdiction over this matter once a Warrant of Removal is issued forthwith, any such motion should be appropriately directed to the U.S. Magistrate Judge or U.S. District Judge hearing the case in the Southern District of New York.